IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MCALLISTER TOWING AND TRANSPORTATION COMPANY, INC., et al. | : : : : | CIVIL ACTION |
| Plaintiffs, v. | : : : : | NO. 12-2208 |
| UNITED STATES OF AMERICA | : : | |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S. J.                                                                                April 22, 2014

      Pending before the Court are Defendant United States of America ("the Government" or "U.S.")'s Second Motion to Dismiss, Plaintiffs McAllister Towing and Transportation Company, Inc. and McAllister Towing of Philadelphia, Inc. (collectively "McAllister")'s Motion for Summary Judgment, and the Government's Motion for Summary Judgment. For the following reasons the Government's Second Motion to Dismiss is granted and McAllister's and the Government's Cross-Motions for Summary Judgment are each denied as moot.

**I.    FACTUAL AND PROCEDURAL HISTORY**[1]

      Plaintiff McAllister Towing and Transportation Company, Inc. is a New York corporation with its principal place of business in New York. (Compl. ¶ 13.) Plaintiff McAllister Towing of Philadelphia, Inc. is a Pennsylvania corporation with its principal place of business in New Jersey. (Id.) McAllister brings this action against the Government pursuant to the Federal Contract Disputes Act of 1978, 41 U.S.C. § 7101 et seq. (Id. ¶ 11.)

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence submitted in conjunction with those briefs. To the extent the parties allege a fact that is unsupported by evidence, the Court does not include it in the recitation of facts.

### A. The U.S.-Global Contract and the Global-McAllister Contract

On August 29, 1996, the Government entered into a contract with Global Associates ("Global") in which the Government agreed to pay approximately $3,000,000 to "furnish direct labor, supervision, administrative support, materials and supplies, vehicles, tools and equipment as specified herein to operate and maintain the Naval Inactive Ship Maintenance Facility (NISMF) at Philadelphia, PA."  (Def.'s Sec. Mot. Dismiss, Ex. B, U.S.-Global "Statement of Work.") Signing the U.S.-Global contract on behalf of the Government as "Contracting Officer" was Peter Proko.  (Def.'s Sec. Mot. Dismiss, Ex. A, U.S.-Global Contract, 1.)   Under its contract with the Government, Global was also "responsible for receipt, inspection, survey, maintenance, and disposal of Naval vessels in locations other than the NISMF Philadelphia, PA (which includes sites outside the state of Pennsylvania)."  (Id.)   The contract specified that Global was "responsible for arranging the repositioning of vessels within the NISMF Philadelphia, PA" and that "[t]he Government will furnish support craft, if required, to accomplish any movement of the vessels."  (Def.'s Sec. Mot to Dismiss, Ex. A, U.S.-Global Contract, 145.)

The contract required Global to generate and submit a "Subcontracting Plan" to the Government.  (Id. at 8.)   Global further agreed that it "shall not issue a subcontract for services or material that will exceed $50,000.00 without specific prior approval from the [U.S.] Contracting Officer."  (Id. at 205.)   Global was also responsible for having a "Purchasing Agent" with "a working knowledge and understanding of procurement regulations, procurement procedures, and other regulations and directives and [the] ability to apply them."  (Id. at 179.)

### B. McAllister's Performance as Subcontractor under the U.S.-Global Contract

On September 11, 1996, two weeks after Global finalized its contract with the

2

Government, Global project manager James Connell sent a letter to McAllister via fax. (Pls.' Mot. Summ. J., Ex. App'x A, Tab 3, Letter of September 11, 1996 from Global to McAllister ("Global Solicitation Letter"), 1.)[2] Global was "soliciting bids/pricing" for "furnish[ing] a tugboat and towing services and other such services as required . . . including docking and undocking, mooring, towing, shifting or other handling of small ships, barges, lighters, tugs, derricks and any other watercraft from time to time as may be ordered by Global Associates Project Manager." (Global Solicitation Letter, List of Services Required, 1.) In its letter to McAllister, Global stated the following:

> Under the provisions of the [U.S.-Global] contract, when directed by the Contractor's On-Site Technical Representative, Global Associates has the authority to purchase material, supplies and services necessary in the performance of the contract, reimbursable by the U.S. Government. Thus, acting as an Agent of the U.S. Government, such purchases are tax exempt per the enclosed certificate.

(Global Solicitation Letter, 1.) Nine days later, on September 20, 1996, Franck Heusser, Port Manager for McAllister, submitted a bid to Global to "furnish . . . tug boats and the equipment that is normally used on our every day operation for moving vessels." (Pls.' Mot. Summ. J., Ex. App'x A, Tab 4, McAllister Bid Letter, 1.) On September 25, 1996, Global informed McAllister via fax that it had selected McAllister's bid and would award McAllister the contract "to provide Tug and Pilot services for the next five (5) years." (Pls.' Mot. Summ. J., Ex. App'x B, Tab 4, Global Award Notice.) The Global-McAllister contract specified that McAllister had received an initial award of one year and a series of four one-year options. (Def.'s Sec. Mot. Dismiss, Ex. D, Global-McAllister Contract, 4.) The contract named Global Associates as the "Prime

---

[2] McAllister has titled its Motion "Motion for Summary Judgment and Opposition to United States' Second Motion to Dismiss." The Court will refer to this filing as McAllister's Motion for Summary Judgment.

Contractor."  (Id. at 10.)  Global exercised its one-year options with McAllister in each of the next three years.  (Def.'s Sec. Mot. Dismiss, Ex. K, McAllister Option Letters.)  Each time, Global sent a letter to McAllister confirming that it was exercising its option "of our Tug Boat and Pilot Service contract with your company."  (Id.)

Over the next three years, whenever McAllister performed work for Global at the NISMF, it submitted an invoice to Global.  (Pls.' Mot. Summ. J., Ex. App'x B, Tab 2, Deposition of Franck Huesser ("Huesser Dep."), 76:23–78:19, May 8, 2013.)  Included in each of McAllister's invoices to Global was the following language:

> **PILOTAGE** We do not furnish pilots or pilotage to vessels making use of or having available their own propelling power, so that whenever any licensed pilot, or a captain of any tug which is furnished or is engaged in the service of assisting the vehicle making use or having available her own propelling power, participates in directing the navigation of such vessel, or in directing the assisting tugs, from on board such vessel or from elsewhere, it is agreed that he becomes the borrowed servant of the vessel assisted and her owner, operator and charterer for all purposes and in every respect, his services while so engaged being the work of the vessel assisted, her owner, operator and charterer, and being subject to the exclusive supervision and control of the vessel's personnel.  Any such service performed by any such person is beyond the scope of his employment for us and neither those furnishing the tugs or lending any such person, nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any act or admission of any such person. . . .  With respect to vessels that are not owned by the person or company ordering the tug service, it is understood and agreed that such person or company warrants that it has authority to bind the vessel owner, operator and charterer to all the provisions of the preceding paragraphs and agrees to indemnify and hold harmless, and also those furnishing the tugs and the tugs, their owners, agents, charterers, operators and managers, from all damages and expenses that may be sustained or incurred in the event and in consequence of such person or company not having such authority.

(Pls.' Mot. Summ. J., Ex. App'x A, Tab 2, McAllister Invoice Form.)

### C. Joseph Flaherty's Appointment as Contracting Officer Representative and S. Richard Wood's Appointment as Alternative Contracting Officer's Representative

On October 31, 1995, Peter Proko, the Government's original contracting officer, appointed Joseph Flaherty as "Contracting Officer's Representative" or "COR" for the NISMF. (Pls.' Mot. Summ. J., Ex. App'x A, Tab 7, Flaherty Appointment Letter.)  As COR, Wood was the "technical representative of the contracting officer in the administration of the [NISMF]" and, among other duties, was "[r]esponsible for promptly furnishing documentation on any requests for change, deviation or waiver (whether generated by the government or the contractor) to the Contracting Officer[.]"  (Id. ¶¶ 2, 6(c).)  Flaherty also gave prior approval to Global on some of the occasions it sought to hire McAllister for its tug and pilot services.  (Pls.' Mot. Summ. J., Ex. App'x B, Tab 4, Deposition of James Connell ("Connell Dep."), 18:10–22:7, July 17, 2003.) Proko's letter appointing Flaherty expressly limited Flaherty's authority as follows:  "You are not authorized . . . to take any action that could result in a change in the cost/price, quantity, quality, place of performance, delivery schedule, or any other terms or conditions of the contract[.]"  (Id. ¶ 5.)

On March 16, 1998, Proko appointed S. Richard Wood as "Alternate Contracting Officer's Representative" ("ACOR") for the Government's contract with Global.  (Pls.' Mot. Summ. J., Ex. App'x A, Tab 13, Wood Appointment Letter, 1.)  Proko's letter appointing Wood as ACOR defined Wood's responsibilities and the scope of his authority with language identical to that used in letter appointing Flaherty as COR, including the provision stating that "[y]ou are not authorized . . . to take any action that could result in a change in the cost/price, quantity, quality, place of performance, delivery schedule, or any other terms or conditions of the contract[.]"  (Id. ¶ 5.)

Wood also gave prior approval to Global on many of the occasions it sought to hire McAllister for its tug and pilot services. (Pls.' Mot. Summ. J., Ex. App'x B, Tab 6, Deposition of S. Richard Wood ("Wood Dep."), 36:15–37:4, Aug. 13, 2013.)

### D.     Towing of the EX-USS GUADALCANAL and Subsequent Litigation

Among the inactive ships kept at the NISMF in Philadelphia was the EX-USS GUADALCANAL. (Pls.' Mot. Summ. J., Ex. App'x A, Tab 17, EX-USS GUADALCANAL Tow Teletype.) On September 27, 1999, the U.S. Navy notified its employees at the NISMF in Philadelphia that, on October 10, 1999, the USNS MOWHAWK would tow the EX-USS GUADALCANAL from its location at the NISMF to a location in Portsmouth, Virginia. (Id.) On or around October 1, 1999, in preparation for the EX-USS GUADALCANAL tow, a Government representative at the NISMF forwarded that message to Global. (Pls.' Mot. Summ. J., Ex. App'x B, Tab 5, Deposition of Charles Walker ("Walker Dep."), 67:18–69:12, Apr. 29, 2013.) On October 1, 1999, Global sought and received approval from Wood to purchase "TUG & PILOT SERVICE TO GET EX-USS GUADALCANAL . . . UNDERWAY." (Pls.' Mot. Summ. J., Ex. App'x A, Tab 2, Global Open Market Purchase Request.) Sometime before October 10, 1999, Global notified McAllister that it required McAllister's services in the towing of the EX-USS GUADALCANAL. (Pls.' Mot. Summ. J., Ex. App'x B, Tab 2, Deposition of Franck Huesser ("Huesser Dep."), 59:1–17, May 8, 2013.)

On October 10, 1999, McAllister dispatched two of its tugboats, the IONA MCALLISTER and the JAMES MCALLISTER, to the NISMF to assist the USNS MOWHAWK in towing the EX-USS GUADALCANAL out of the NISMF. (Pls.' Mot. Summ. J., Ex. App'x A, Tab 18, Bruemmer Settlement Agreement.) McAllister also lent the services of a tug pilot, Curt

Chamberlain, who was aboard the EX-USS GUADALCANAL.  (Id.)  Working aboard the USNS MOWHAWK that day was Todd Bruemmer ("Bruemmer"), a civilian merchant seaman employed by the Government.  (Pls.' Mot. Summ. J., Ex. App'x A, Tab 17, Injured Person Report.)  After the EX-USS GUADALCANAL had been towed past the pier at the NISMF, tension on a cable running from the EX-USS GUADALCANAL to the USNS MOWHAWK caused one of the towing guides on the deck of the USNS MOWHAWK to break apart.  (Id.)  Pieces of the broken towing guide struck and injured Bruemmer.  (Id.)  At that point, the Navy aborted the tow of the EX-USS GUADALCANAL.  (Id.)

That same day, McAllister sent Global a bill for $4,968.00 for its services and an additional $414.00 for charges incurred in towing the EX-USS GUADALCANAL back to the NISMF after Bruemmer's injury.  (Def.'s Sec. Mot. Dismiss, Ex. I, Deposition of Mary Lou Dickens ("Dickens Dep."), 124:10–125:24, June 12, 2013.)  McAllister later received payment for these services in the form of a check from Global.  (Id.)

Bruemmer and his wife brought an action in the Court of Common Pleas of Philadelphia County seeking damages from numerous defendants, including Global and McAllister. (Bruemmer Settlement Agreement at 1–2.)  McAllister then filed a Third Party Complaint in the action against the United States and Global for tortious contribution and indemnity.  (Compl. ¶ 3.) This Court subsequently dismissed the claims against the United States as being barred by the Federal Employees Compensation Act, 5 U.S.C. § 8101 et seq.  In re McAllister Towing & Transp. Co., Inc.  No. Civ.A.02-858, 2004 WL 2009330, at *11 (E.D. Pa. Sept. 9, 2004). McAllister and Global eventually settled with the Bruemmers and paid the Bruemmers $2,125,000 in exchange for a full release from their claims.  (Id. ¶ 7.)

  **E.  The Present Case**

On April 23, 2012, McAllister initiated the present litigation under the Contract Disputes Act[3], 41 U.S.C. § 7101 et seq., to recover from the United States the $2,125,000 payment to the Bruemmers, as well as $726,115.90 in costs accrued while defending against and settling the Bruemmers' claims.  On October 18, 2012, the Government filed its first Motion to Dismiss for Lack of Subject Matter Jurisdiction.  The Court denied that Motion to allow further discovery on factual issues with a direct bearing on subject matter jurisdiction, including but not limited to whether an authorized Government official ever ratified any contract with McAllister.  See McAllister Towing & Transp. Co., Inc. v. U.S., No. Civ.A. 12-2208, 2013 WL 18391, at *3–4 (E.D. Pa. Jan. 8, 2013).

The Government filed its pending Second Motion to Dismiss on October 21, 2013.  On November 27, 2013, McAllister filed its Motion for Summary Judgment and Opposition to the United States' Second Motion to Dismiss.  The Government filed a Reply to McAllister's Opposition and its own Motion for Summary Judgment on December 13, 2013.  McAllister filed a Response to the Government's Motion for Summary Judgment on January 3, 2014.  The Motions are now ripe for review.

## II.     STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the power of a federal court to hear a claim or a case.  Gould Elecs., Inc. v. U.S., 220 F.3d 169, 178 (3d Cir. 2000).  When presented with a Rule 12(b)(1) motion, the plaintiff "will have the burden of proof that jurisdiction does in fact exist."  Petruska v. Gannon Univ., 462 F.3d 294, 302 (3d

---

[3] Normally claims brought against the United States under the Contract Disputes Act must be brought in the Court of Federal Claims, but maritime contracts are exempt from this provision and may be brought in U.S. District Court.  See 41 U.S.C. § 7102(d); 46 U.S.C. § 30903; 28 U.S.C. § 1333.

Cir. 2006).

There are two types of Rule 12(b)(1) motions. The first is a "facial" attack, which assumes that the allegations of the complaint are true, but contends that the pleadings fail to present an action within the court's jurisdiction. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). If the complaint is deficient as pled, the court should grant leave to amend before dismissing it with prejudice. Shane v. Fauver, 213 F.3d 113, 116–17 (3d Cir. 2000). The motion should only be granted if it appears with certainty that assertion of jurisdiction would be improper. Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000).

The second form of a Rule 12(b)(1) motion is a "factual" attack, which argues that, while the pleadings themselves facially establish jurisdiction, one or more of the factual allegations is untrue, thereby causing the case to fall outside the court's jurisdiction. Mortensen, 549 F.2d at 891. In such a case, the court must evaluate the merits of the disputed allegations because "the trial court's . . . very power to hear the case" is at issue. Id.; Carpet Grp., 227 F.3d at 69.

In this case, the Government's 12(b)(1) motion is a "factual" attack, meaning it challenges the court's subject matter jurisdiction as a matter of fact. Thus, the Court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Petruska, 462 F.3d at 302. "In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Id.

## III. DISCUSSION

For a plaintiff to be able to bring a claim against the Government, the Government must first waive its sovereign immunity. Beneficial Consumer Disc. Co. v. Poltonowicz, 47 F.3d 91,

93–94 (3d Cir. 1995).  Any waiver of sovereign immunity "must be unequivocally expressed in statutory text and will not be implied."  Lane v. Peña, 518 U.S. 187, 192 (1996).  It is well settled that the Government expressly waives its sovereign immunity under the Contract Disputes Act of 1978 ("the CDA"), 41 U.S.C. § 7101 et seq.  See Winter v. FloorPro, Inc., 570 F.3d 1367, 1370 (Fed. Cir. 2009) (quoting Cosmic Const. Co. v. U.S., 697 F.2d 1389, 1390 (Fed. Cir. 1982) ("This court has recognized that the CDA is 'a statute waiving sovereign immunity, which must be strictly construed.'")

Under the CDA, a plaintiff may only bring a claim against the Government if he or she is "a party to a Federal Government contract other than the Federal Government."  41 U.S.C. § 7101(7).  A contractor "need not assert a specific contractual provision" to bring a claim under the CDA and "is only required to assert entitlement that has some legal basis."  BLR Grp. of Am., Inc. v. U.S., 84 Fed. Cl. 634, 640 (Fed. Cl. 2008).

The Government argues that McAllister cannot bring an action under the CDA—therefore depriving this Court of subject matter jurisdiction—because McAllister was never a party to a contract with the Government.  McAllister responds with three primary theories for recovery from the Government: (1) Global acted as the Government's "purchasing agent" and bound the Government to a contract with McAllister; (2) the Government ratified an implied contract between itself and McAllister; and (3) the "pilotage clause" included in McAllister's invoices to Global entitles McAllister to indemnity from the Government.  The Court will address these arguments separately.

### A.     McAllister Cannot Show a Contract Between Itself and the Government under a "Puchasing Agency" Theory.

The Government argues in its Motion to Dismiss that there was no express contract

between McAllister and the Government because McAllister never contracted with any Government official with the authority to bind the Government. McAllister responds that it did have a contract with the Government because Global was acting as the Government's "purchasing agent" for services that were outside the scope of Global's contract with the Government.

The Government can be contractually bound to a subcontractor when the prime contractor acts as the Government's purchasing agent. U.S. v. Johnson Controls, 713 F.2d 1541, 1551 (Fed. Cir. 1983). For a subcontractor to bind the Government, the following conditions must be met: "(1) [the prime contractor was] acting as a purchasing agent for the government, (2) the agency relationship between the government and the prime contractor must be established by clear contractual consent, and (3) the contract [between the Government and the prime contractor] stated that the government would be directly liable to the vendors for the purchase price." Id. (citing Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 112 n.2 (1954)).

McAllister makes a colorable argument that the facts of this case meet the first two prongs of Johnson Controls. It is plausible that Global was acting as the Government's purchasing agent when, acting under its contract with the Government to "furnish support craft, if required, to accomplish any movement of the vessels" (U.S.-Global Contract at 145), Global represented to McAllister that it was "acting as an Agent of the U.S. Government." (Global Solicitation Letter at 1.)[4] It is similarly plausible that Global had "clear contractual consent" to act as the Government's purchasing agent because it sought and received the approval of Joseph Flaherty and S. Richard Wood—Government officials with powers delegated from the Contracting Officer

---

[4] McAllister's argument that Global was "acting as an Agent of the U.S. Government" is somewhat undermined by Global's annual option renewal letters to McAllister confirming that Global was exercising its option "of *our* Tug Boat and Pilot Service contract with *your* company." (McAllister Option Letters (emphasis added).)

to be the "technical representative of the contracting officer in the administration of the [U.S.-Global] contract" (Flaherty Appointment Letter, 2; Wood Appointment Letter, 2)—before it purchased "TUG & PILOT SERVICE" from McAllister. (Global Open Market Purchase Request.) Assuming *arguendo*—for the purposes of the pending Second Motion to Dismiss only—that McAllister has met its burden under the first two prongs of the Johnson Controls test, McAllister's argument fails because it cannot show that Global's contract with the Government "stated that the government would be directly liable to the vendors for the purchase price." Johnson Controls, 713 F.2d at 1551.

In support of its argument that the Government was "directly liable to [McAllister] for the purchase price" of its services, McAllister cites language in the U.S.-Global contract stating that "[t]he Government will [b]ear all costs associated with towing rigs to and from the NISMF Philadelphia, PA." (U.S.-Global Contract 203.) McAllister asserts that "this language obligates the Government to pay McAllister for the costs associated with this effort." (Pls.' Mem. Supp. Mot. Summ. J. at 18.) Global's contract with the Government is a maritime contract and, as such, "should be read as a whole and its words given their plain meaning unless the provision is ambiguous." Piché v. Stockdale Holdings, LLC, No. Civ.A.2006-79, 2009 WL 799659, at *6 (D.V.I. Mar. 24, 2009) (quoting Weathersby v. Conoco Oil Co., 752 F.2d 953, 955 (5th Cir. 1984)).[5]

Here, McAllister attempts to stretch the words "[b]ear all costs" beyond their plain meaning. While the Government may have agreed to "[b]ear all costs associated with towing rigs to and from the NISMF Philadelphia, PA" (Global Contract at 203), there is nothing in that

---

[5] See also In re Frescati Shipping Co., Ltd., 718 F.3d 184, 190 (3d Cir. 2013) (interpreting the term "approach" in a maritime contract by using its dictionary definition).

language, nor any other language in the 200-plus-page U.S.-Global contract, indicating that the Government would be "directly liable to vendors" like McAllister for tug and/or pilot services. Under the plain meaning of "[b]ear all costs," the Government only agreed to reimburse Global for "costs associated with towing rigs to and from the NISMF Philadelphia, PA." (Id.) This plain meaning definition of "[b]ear all costs" in the course of McAllister's performance as a subcontractor under the U.S.-Global contract. On October 10, 1999, the date of the aborted tow of the EX-USS GUADALCANAL, McAllister sent a bill for $4,968.00 for its services to Global, not to the Government. (Dickens Dep. 124:10–125:24.) In turn, McAllister later received payment for these services in the form of a check from Global, not from the Government. (Id.)

McAllister cannot show that the U.S.-Global contract "stated that the government would be directly liable to the vendors for the purchase price." Johnson Controls, 713 F.2d at 1551. As such, McAllister's "purchasing agent" theory for a contract between itself and the Government fails.

### B. The Government Never Ratified Any Implied Contract with McAllister.

The Government argues in its Motion to Dismiss that it never had any implied contract with McAllister because no Government official with actual authority to bind the Government ever ratified any such contract with McAllister. McAllister responds that it had an implied contract with the Government because the Government ratified the contract when Joseph Flaherty or S. Richard Wood approved Global's hiring of McAllister and when the Government accepted the benefit of McAllister's services.

An implied-in-fact contract exists where there is a "meeting of the minds" such that a contract "is inferred, as a fact, from the conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." Hercules, Inc. v. U.S., 516 U.S. 417, 424 (1996)

(quoting Balt. & Ohio R.R. Co. v. U.S., 261 U.S. 592, 597 (1923)).  To show the existence of an implied contract, a party must prove: "1) mutuality of intent to contract; 2) consideration; and, 3) lack of ambiguity in offer and acceptance."  City of El Centro v. U.S., 922 F.2d 816, 820 (Fed. Cir. 1990).  To show an implied contract with the Government, a party must also prove a fourth element: "the Government representative whose conduct is relied upon [had] actual authority to bind the [G]overnment in contract."  Id. (internal citations omitted).

  Even assuming—for the purposes of the pending Motion to Dismiss only—that McAllister can meet its burden under the three prongs of a general implied contract, it cannot show that the Government representative whose conduct is relied upon had actual authority to bind the Government in contract.  "Contracts may be entered into and signed on behalf of the Government only by contracting officers."  Federal Acquisition Regulation ("FAR") § 1.601(a) (2014).  Contracting officers may, however, delegate their authority to "certain authorized representatives."  FAR § 2.101 (2014).  When delegating authority to an authorized representative, the scope of that authority is determined "by the contracting officer."  Id.

  The Government is correct that "[t]he only official with authority to bind the United States is and was the Contracting Officer . . . Peter Proko."  (Def.'s Mem. Supp. Sec. Mot. Dimiss at 17.) While it is true that Proko delegated some of his authority to Joseph Flaherty and S. Richard Wood when he appointed Flaherty as Contracting Officer's Representative and Wood as Alternative Contracting Officer's Representative, Proko expressly and painstakingly detailed the limits of Flaherty and Wood's authority in the letters appointing them.  (Flaherty Appointment Letter; Wood Appointment Letter.)  Even though Flaherty and Wood were each the "technical representative[s] of the contracting officer in the administration of the [U.S.-Global] contract,"

14

they lacked the authority to "take any action that could result in a change in the cost/price, quantity, quality, place of performance, delivery schedule, or any other terms or conditions of the contract[.]"  (Flaherty Appointment Letter ¶¶ 2, 5; Wood Appointment Letter ¶¶ 2, 5.)

On numerous occasions, Global sought and received either Flaherty or Wood's approval for purchasing services from McAllister.  (Connell Dep. 18:10–22:7; Wood Dep. 36:15–37:4.)  In particular, Wood signed off on the services Global purchased from McAllister to assist in the towing of the EX-USS GUADALCANAL.  (Open Market Purchase Request; Wood Dep. 36:15–37:4.)  While Global received Flaherty's and/or Wood's approval to contract with McAllister, neither Flaherty nor Wood had the authority to "change . . . the cost/price, quantity, quality, place of performance, delivery schedule, or any other terms or conditions of the contract," let alone bind the Government to a brand new contract with McAllister, because it would have exceeded the express limits of their authority.  (Flaherty Appointment Letter ¶ 5; Wood Appointment Letter ¶ 5.)  McAllister points to no source of Flaherty's or Wood's authority, other than their appointment as COR and ACOR respectively, nor does McAllister point to any other Government official as having the "actual authority to bind the [G]overnment in contract" with McAllister.  City of El Centro, 922 F.2d at 820.  Accordingly, McAllister cannot meet its burden to show an implied contract with the Government.

      **C.**      **The "Pilotage Clause" in McAllister's Invoices to Global Does Not Entitle It to Indemnity from the Government.**

Finally, McAllister argues that it is entitled to indemnity from the Government because of the "Pilotage Clause" included in McAllister's invoices to Global.  The "Pilotage Clause" stated that "any licensed pilot, or a captain of any tug" McAllister furnished to Global was "the borrowed servant of the vessel assisted and her owner, operator and charterer for all purposes and in every

respect" and that "with respect to vessels that are not owned by the person or company ordering the tug service, it is understood and agreed that such person or company warrants that it has authority to bind the vessel owner to all the provisions of this contract and agrees to indemnify and hold [McAllister] harmless[.]"  (McAllister Invoice Form.)

McAllister argues that, through its course of dealing with the Government, this language entitles it to indemnity from the Government.  For the reasons stated above, Global never acted as a "purchasing agent" for the Government, and thus, could not have bound the Government to any language appearing in the invoices that McAllister sent to Global.  Moreover, McAllister never had an implied contract with the Government into which the "Pilotage Clause" could be incorporated, because it never had a course of dealing with any Government official with actual authority to bind the Government.  Therefore, the "Pilotage Clause" does not entitle McAllister to indemnity from the Government.

After considering the evidence in the record, the Court finds that it lacks the authority to hear this case.  McAllister cannot meet its burden to show that it had a contract with the Government.  As such, McAllister does not have a cause of action against the Government under the Contract Disputes Act and this Court lacks subject matter jurisdiction over this case. Accordingly, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court will grant the Government's Second Motion to Dismiss.

**IV.   CONCLUSION**

For all of the foregoing reasons, the Court will grant the Government's Second Motion to Dismiss and deny the parties' Cross-Motions for Summary Judgment as moot.

An appropriate order follows.